**IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF COLORADO
Judge Daniel D. Domenico**

Case No. 1:19-cv-01040-DDD-NRN

DEBORAH LINGENFELTER,

   Plaintiff,

v.

KAISER FOUNDATION HEALTH PLAN OF COLORADO,

   Defendant.

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

This case is before the court on Defendant Kaiser Foundation Health Plan of Colorado's motion for summary judgment on Plaintiff Deborah Lingenfelter's claims for (1) retaliation under the Family and Medical Leave Act (FMLA) and (2) association discrimination under the Americans with Disabilities Act (ADA). Doc. 48. For the following reasons, the court GRANTS the motion.

### BACKGROUND

Ms. Lingenfelter was employed by Kaiser as an MRI technologist from 2009 until December 11, 2017. Doc. 48 at ¶¶ 1, 46; Doc. 49 at p. 1.[1] During her employment at Kaiser, she had applied for and received intermittent FMLA leave to care for her sons who are autistic. *Id.* at ¶ 9.

This suit centers on why Kaiser terminated her employment. Ms. Lingenfelter contends that Kaiser fired her because she exercised her

---

[1] Unless expressly stated, the facts in this section are undisputed.

rights under the FMLA and the ADA to care for her sons. Kaiser says it was Ms. Lingenfelter's fault because she refused to accept responsibility for gossip she spread about a co-worker. The key players in the dispute are Ms. Lingenfelter and Cindy Cameron, who was Ms. Lingenfelter's boss starting in 2016 until she was fired. *Id.* at ¶ 5.

Soon after Ms. Cameron began that role, the two met one-on-one. *Id.* at ¶ 6. Ms. Lingenfelter told Ms. Cameron about her sons who, according to Ms. Lingenfelter are "high-functioning autistic." *Id.* at ¶ 7. Ms. Lingenfelter also told Ms. Cameron that she would like to return to a part-time shift schedule. *Id.* Ms. Cameron responded that "we'll have to see about staffing" and promised to look into it. Doc. 48-1 at 79:10–11. In two later conversations, Ms. Lingenfelter repeated her request for reduced hours. *Id.* at ¶ 9. Ms. Cameron rejected the request but offered for Ms. Lingenfelter to switch shifts and start her shifts later in the day. Doc. 48-1 at 85:15–23.

From March to December 2017, Ms. Cameron initiated seven disciplinary actions against Ms. Lingenfelter. *See* Doc. 48 at ¶¶ 32. Ms. Lingenfelter was, during her employment at Kaiser, a member of the Service Employees International Union Local 105, and so the disciplinary actions proceeded under the employee-discipline procedure agreed to in the union's collective-bargaining agreement. *See* Doc. 48 at ¶ 4. That procedure escalates through five levels, starting at Level 1 with an "oral reminder," and culminating in Level 5 termination. *See* Doc. 48-4.

The first disciplinary action occurred in March 2017 and arose from a patient incident, the nature of which is unclear from the parties' briefing. Doc. 48-1 at 111:4–22. Ms. Lingenfelter, her union steward, and Ms. Cameron participated in a "Joint Objective Discovery" meeting,

which is a Level 1 conversation about a performance or behavioral issue. Doc. 48 at p. 4, ¶¶ 11–12. Under the grievance procedure, no formal notation is put in an employee's file for a Level 1 meeting, Doc. 48-4 at 2, and Ms. Lingenfelter received no formal discipline for the March 2017 issue. Doc. 48 at p. 4, ¶ 13.

The second and third disciplinary actions concerned Ms. Lingenfelter's tardiness. On April 14, 2017, Ms. Lingenfelter, her union steward, and Ms. Cameron held a Joint Objective Discovery meeting to discuss six instances of tardiness, one of which was excused. *See* Doc. 48-3. That meeting culminated in an agreement to correct the behavior, but no formal discipline. Doc. 48 at p. 5, ¶ 15. On June 14, 2017, the parties had another Joint Objective Discovery meeting because Ms. Lingenfelter had accumulated ten late- or sick-days in the preceding year. Doc. 48-6 at 1. Five of those days, however, were accrued for purposes of Ms. Lingenfelter's FMLA leave. *Id.* at 3. Again, no disciplinary action beyond the meeting was taken.

Ms. Cameron initiated a fourth disciplinary action in August 2017 because Ms. Lingenfelter had failed to timely respond to emails. Doc. 48 at p. 5, ¶ 20. Ms. Cameron and Ms. Lingenfelter had a Joint Objective Discovery Meeting about meeting, and no formal disciplinary action was taken. *Id.*

The fifth disciplinary action arose from a report by one of Ms. Lingenfelter's co-workers that Ms. Lingenfelter had failed to perform a required safety check for an MRI patient with ear implants. *Id.* at p. 6, ¶ 21. Ear implants can pose a danger during MRI scans, and Ms. Lingenfelter permitted the patient to be scanned without checking for the patient's implants. *Id.* After a Level 1 meeting, Ms. Lingenfelter agreed to "communicate perceived safety issues with [her] manager."

Doc. 48-8. Ms. Cameron took no further disciplinary action because she believed Ms. Lingenfelter had had a "courageous conversation." *Id.*

Intervening between the fifth and sixth formal disciplinary actions was an incident involving Ms. Lingenfelter's request for FMLA leave in October 2017. At the end of her shift on October 3, Ms. Lingenfelter found out that one of her sons was in a fight at school. Doc. 48 at p. 6, ¶ 23. Ms. Lingenfelter told Ms. Cameron that she was going to leave work early to pick up her son. *Id.* At the school, Ms. Lingenfelter learned that the fight was caused by her son's disability. *Id.* at p. 6, ¶ 25. Ms. Lingenfelter took her son to the hospital, and texted Ms. Cameron to ask for the following day off of work and that her absence be counted as FMLA:

> Cindy, I won't be in tomorrow. I'm in the hospital with my son. FMLA
> I will let you know more tomorrow.
> Please let me know you received this.

Doc. 48 at pp. 6–7, ¶ 25; Doc. 48-10 at 4. Ms. Cameron responded:

> Deb, my understanding when you left today [was] that [Ms. Lingenfelter's son] injured himself by getting into a fight and getting his head injured[,] which is not covered by his FMLA as I understand it. If you need this as FMLA I will need a doctors note. Thx.

Doc. 48-10 at 4. The next morning, Ms. Lingenfelter wrote back thanking Ms. Cameron "for her concern," explaining that her absence was covered by FMLA, and attaching a picture of doctor's note. *Id.* Ms. Lingenfelter's union representative grieved Ms. Cameron to human resources for this exchange, because Ms. Cameron required Ms. Lingenfelter to produce a doctor's note. Doc. 49 at p. 6, ¶ 69.

4

The sixth disciplinary action arose from a November 30 email from one of Ms. Lingenfelter's co-workers, Westley Espinosa, to Ms. Cameron. Mr. Espinosa made two key assertions in the email. First, he wrote that "last month Debbie concocted a story that portrayed me as a terrible person, attempting to convince several staff members that I had nefarious intent with the meeting I facilitated in your absence." Doc. 48-11 at 2. "She has continuously harassed and bullied not only me, but several individuals in relation the aforementioned instance." *Id.* Second, Mr. Espinosa wrote that "today, Debbie attempted to defame my character again, suggesting to [another co-worker] that there is some impropriety between [a male physician at the clinic] and I." *Id.* "Comments like this," Mr. Espinosa continued, "are becoming commonplace and are undermining my reputation and professional relationships within the department." *Id.* Two receptionists confirmed to Ms. Cameron that Ms. Lingenfelter had said Mr. Espinosa was in a romantic relationship with a male physician at the clinic. Doc. 48-12; Doc. 48-13.

Ms. Lingenfelter acknowledges she told the receptionists that Mr. Espinosa had an "inappropriate relationship" with the physician, but she says she did not mean her comment to "refer[] to homosexuality." Doc. 49-1 at p.2, ¶¶ 10–11. Ms. Lingenfelter also says that she and Mr. Espinosa have a long, discordant history. According to the declaration Ms. Lingenfelter submitted along with her response in opposition to Kaiser's motion for summary judgment, during a staff meeting in August 2017, Mr. Espinosa stated, "Everybody is saying that the reason for the problems is you, Debbie. You are always out on FMLA. We are short-staffed." Doc. 49-1 at p.2, ¶ 7. There is conflicting evidence about whether Ms. Cameron was at this meeting and when the meeting occurred. On the one hand, Ms. Lingenfelter testified at her deposition

5

that she was "leaning towards" Ms. Cameron not having been at the meeting. Doc. 54-1 at 158:24. She also testified that the meeting occurred in the summer of 2016. *Id.* at 160:9–12. On the other hand, Ms. Lingenfelter's declaration says that the meeting occurred in August 2017. Doc. 49-1 at ¶ 7.[2]

The seventh and final disciplinary action arose from allegations by Mr. Espinosa and another co-worker that Ms. Lingenfelter was not observing a patient while that patient was receiving an MRI. Doc. 48-15. According to notes taken by Ms. Cameron about these allegations, "Deb [was] at the runners station looking at her personal phone and not looking at her machine where her patient was." *Id.* at 2.

Ms. Cameron convened a meeting with Ms. Lingenfelter and her union steward on December 6 to address the two allegations made by Mr. Espinosa. As for the claimed inappropriate relationship, Ms. Lingenfelter said at the meeting that her statement was taken out of context and that she had been referring to negative comments Mr. Espinosa made to the physician about their co-workers. Doc. 48 at p. 8, ¶ 34. As for the MRI-observation issue, Ms. Lingenfelter acknowledged that she was at the runner's station but said she was not "on [her] phone." Doc. 48-15 at 3. As a result of the statements about Mr. Espinosa, Ms. Cameron put Ms. Lingenfelter on a Level 4 corrective-

---

[2] One of Ms. Lingenfelter's colleagues also testified that Ms. Cameron was at a meeting where Mr. Espinosa made a comment about "ripping off the band aid." But that testimony contradicts Ms. Lingenfelter's declaration in key aspects—namely that the meeting occurred in 2016 and that Mr. Espinosa's comment was directed at Ms. Lingenfelter's tardiness not her FMLA leave. *See* Doc. 49-5 at 40:23–24. That is, the facts viewed in the light most favorable to Ms. Lingenfelter derive solely from the declaration she submitted along with her response brief.

action plan.[3] Doc. 48-16. Ms. Cameron required Ms. Lingenfelter to "write a letter that will address the statement [,] her accountability in the statement," and the steps she was planning to take to mend the relationship with her co-workers. *Id.* at 3. Under the collective-bargaining agreement's grievance procedure, failure to comply with a Level 4 corrective-action plan leads to termination at Level 5. Doc. 48-4 at 7.

Ms. Cameron, Ms. Lingenfelter, and Ms. Lingenfelter's union steward reconvened a week later, on the 11th, to obtain Ms. Lingenfelter's Level 4 letter. Doc. 48 at p. 10, ¶ 39. The steward, Tori Mayberry, started off by objecting to the disciplinary process, specifically that Ms. Cameron had skipped Levels 1–3, proceeding immediately to Level 4. *Id.* at p. 10, ¶ 40. Ms. Lingenfelter then presented Ms. Cameron with a handwritten letter containing one sentence—"I, Deborah Lingenfelter will act professionally."—and her signature. Doc. 48-20. Ms. Lingenfelter testified that, later in the meeting, she supplemented added to the letter: "I will not discuss work place issues at the front desk with co-workers." Doc. 48 at p. 11, ¶ 44. Ms. Cameron refused to accept the letter. Doc. 48 at p. 10, ¶ 42.

The parties agree about the events at the meeting up to this point. They disagree, however, over whether Ms. Lingenfelter presented a different letter she had prepared the day after the December 6 Joint Objective Discovery meeting. This letter, according to Ms. Lingenfelter's

---

[3] The parties describe this letter as falling at Level 4 of the grievance procedure, but the procedure itself refers to a corrective-action plan occurring at Level 3. Doc. 48-4 at 4–5. Level 4 appears to be a "Day of Decision" meeting where the employee and a manager discuss continued bad behavior, the employee is placed on paid leave for one day, and then the parties agree to a "Last Chance Agreement" that the employee must sign or face termination. Doc. 48-4 at 60.

declaration submitted with her response brief, "committed to correcting the situation with Mr. Espinoza [sic]." Doc. 49-1 at ¶ 15. Ms. Lingenfelter's declaration says, further, that she gave the alternative letter to Ms. Cameron and that Ms. Cameron wouldn't accept it. *Id.* Ms. Lingenfelter supports these assertions with a second declaration from Ms. Mayberry that Ms. Cameron "would not even look at Ms. Lingenfelter's December 7 commitment letter." Doc. 49-2 at ¶ 8. This version of the facts contradicts Ms. Lingenfelter's deposition testimony:

> Q. Okay. Did you ever present a different or separate letter . . . during that meeting on December 11th?
>
> A. Nope. No.

Doc. 48-1 at 207:22–25; *see also id.* at 210:17–20 (same); *id.* at 214:6–18 (same).

The parties agree that, regardless of whether both letters were presented, Ms. Cameron left the meeting, discussed the issue with a human-resources representative, and returned to the meeting with a termination letter for Ms. Lingenfelter. *Id.* at p. 11, ¶¶ 45–48. The letter stated that Ms. Lingenfelter was being terminated for "unsatisfactory job performance." *Id.* at p. 11, ¶ 48. According to Ms. Cameron's notes prepared after the meeting, when she returned to terminate Ms. Lingenfelter, Ms. Mayberry "waived a paper . . . saying they had a letter." Doc. 49-13 at 3. Ms. Cameron responded that, because Ms. Lingenfelter hadn't presented the commitment letter at the outset of the meeting as was required by the grievance process, Ms. Cameron would not accept it. *Id.*

This suit for FMLA retaliation and ADA discrimination followed.

## DISCUSSION

## I. Summary Judgment

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary judgment "if but only if the evidence reveals no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *MarkWest Hydrocarbon, Inc. v. Liberty Mut. Ins. Co.*, 558 F.3d 1184, 1190 (10th Cir. 2009). The court views "the facts and all reasonable inferences those facts support in the light most favorable" to Plaintiffs. *Id.* at 1189–90. "An issue of material fact is genuine only if the nonmovant presents facts such that a reasonable factfinder could find in favor of the nonmovant." *S.E.C. v. Thompson*, 732 F.3d 1151, 1157 (10th Cir. 2013) (alteration adopted). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact …, the court may … consider the fact undisputed for purposes of the motion." Fed. R. Civ. Proc. 56(e)(2).

## II. The FMLA and the ADA

The Family and Medical Leave Act creates a private right of action for employees who are retaliated against for exercising a right or rights guaranteed them by the FMLA. 29 U.S.C. § 2615(a)(2). "Retaliation claims under the FMLA are subject to the burden-shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973)." *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006). "The plaintiff bears the initial burden of establishing a prima facie case of retaliation." *Id.* "If the plaintiff does so, then the defendant must offer a legitimate, non-retaliatory reason for the employment action." *Id.* The plaintiff bears the ultimate burden of demonstrating that the defendant's reason is pretextual. *Id.* To state a prima facie claim of retaliation, Ms. Lingenfelter must show that (1) she engaged in activity protected under the FMLA, (2) that Kaiser took a materially adverse employment action against her, and (3) "there exists a causal

connection between the protected activity and the adverse action." *Id.* at 1171. If Kaiser offers a legitimate non-retaliatory reason for termination, to defeat summary judgment Ms. Lingenfelter must show that there is a genuine dispute of material fact that those reasons are pretextual. *Id.*

The burden-shifting framework from *McDonnell Douglas* also applies to Ms. Lingenfelter's claim of discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12112(b)(4). *Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1085 (10th Cir. 1997). Under that framework, Ms. Lingenfelter bears the initial burden to prove a prima facie case of disability discrimination. *Id.* She must demonstrate that she was qualified for her job; that Kaiser took an adverse employment action against her; that Kaiser knew Ms. Lingenfelter had a relative with a disability; and that there was a causal connection between the adverse action and Kaiser's knowledge of Ms. Lingenfelter's relative's disability. *Id.* If she makes her prima facie case, the burden shifts to Kaiser to offer a non-discriminatory reason. *Id.* If Kaiser does so, to survive summary judgment, Ms. Lingenfelter must show there is a genuine dispute of material fact that Kaiser's reason is pretextual. *Id.*

### III.   Kaiser's Motion

Kaiser moves for summary judgment on two bases. First, Kaiser argues that Ms. Lingenfelter has failed to adduce prima facie evidence of causation. Second, Kaiser argues that Ms. Lingenfelter has no evidence of pretext.

The court disagrees that Ms. Lingenfelter hasn't provided evidence of causation. The key issue for causation at the "prima facie stage is 'whether the plaintiff has demonstrated that the employer's action occurred under circumstances which give rise to an inference of

unlawful discrimination.'" *Metzler*, 464 F.3d at 1171 (quoting *Garrett v. Hewlett-Packard Co.,* 305 F.3d 1210, 1221 (10th Cir. 2002)). "A causal connection is established where the plaintiff presents evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Garrett,* 305 F.3d at 1221 (quoting *Bullington v. United Air Lines, Inc.,* 186 F.3d 1301, 1320 (10th Cir. 1999). This standard is "low." *Id.*

The temporal connection between the protected activity and the adverse employment action here is sufficient to give rise to support causation under Tenth Circuit precedent. Ms. Lingenfelter requested FMLA leave on October 3, 2017 for her son's fight at school. Ms. Cameron pushed back on the request, but ultimately granted it. Ms. Lingenfelter was terminated two months and one week later. This temporal proximity is perhaps pushing the edges of what could support an inference of retaliatory motive, but it is enough to survive summary judgment. *See Ramirez v. Oklahoma Dep't of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994) (noting that a two-month lapse is sufficient to show causation for a claim of retaliation); *see also Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (expressing hesitation, but assuming without deciding that "two months and one week is sufficient to support a prima facie case of retaliation").

There is, moreover, other evidence that could give rise to an inference of causation. The fact that, for example, Ms. Cameron had initiated disciplinary actions against Ms. Lingenfelter throughout 2017 for events relating to FMLA leave suggests at least some connection between Ms. Lingenfelter's termination and protected conduct. Causation is also suggested the evidence that for a number of the disciplinary actions along with the October 3, 2017 FMLA kerfuffle, Ms. Lingenfelter's union lodged grievances against Ms. Cameron for improper use of the

11

disciplinary process. This evidence is sufficient to permit a reasonable juror to draw a connection between Ms. Lingenfelter's FMLA leave and her termination.

Kaiser, though, has offered a legitimate reason for her termination: that she was fired for failing to write a letter taking responsibility for the comments she made about Mr. Espinosa. So the burden shifts back to Ms. Lingenfelter to produce proper evidence that would show that Kaiser's explanation is pretextual. Ms. Lingenfelter relies on four categories of evidence to establish pretext: (1) the timing of her firing; (2) the comments of her co-workers about her tardiness; (3) the fact that Ms. Cameron refused to review her commitment letter; and (4) the immediate escalation to a Level 4 disciplinary action in December 2017. None of these, alone or together, establishes pretext.

Unlike the minimal requirement for a prima-facie showing, the Tenth Circuit "has refused to allow even 'very close temporal proximity to operate as a proxy for the evidentiary requirement' that the plaintiff demonstrate pretext." *Id.* (quoting *Annett v. Univ. of Kan.,* 371 F.3d 1233, 1241 (10th Cir. 2004)). To raise a fact question on pretext, then, Ms. Lingenfelter must offer evidence of proximity plus other evidence of retaliatory motive. *Id.*

Nor can the comments of her colleagues be used to establish pretext. Ms. Lingenfelter's declaration repeats the alleged 2017 comment of Mr. Espinosa that "Everybody is saying that the reason for the problems is you, Debbie. You are always out on FMLA." Doc. 49-1 at ¶ 7. Her declaration also cites to comments made by co-workers that her FMLA leave was causing the quality of her work to suffer. *See, e.g., id.* at ¶ 8.

This declaration is inadequate to avoid summary judgment. It consists of Ms. Lingenfelter's recounting of statements other people

12

made that would support her theory of the case that she was punished because of her protected leave-taking. A declaration by one person about another's alleged statement of the fact in dispute, though, is a textbook definition of hearsay. And hearsay evidence cannot be used to defeat summary judgment. *Jaramillo v. Colorado Judicial Dep't*, 427 F.3d 1303, 1314 (10th Cir. 2005) ("Hearsay testimony that would not be admissible at trial is not sufficient to defeat a motion for summary judgment."), *as modified on denial of reh'g* (Dec. 20, 2005).

Ms. Lingenfelter argues that this isn't hearsay because she doesn't offer these comments for their truth but rather to "show the complaints directed at [her] FMLA leave." Doc. 49 at 5n.3. And certainly she doesn't offer them to prove that she was, in fact, a "problem" employee. But they are still offered for their truth: to show that "everyone," apparently including Ms. Cameron, the decisionmaker, believed Ms. Lingenfelter's FMLA leave was problematic. *See Metzler*, 464 F.3d at 1179 (evidence must establish that the decisionmakers in the employment action "did not honestly believe" the reasons given). This is essentially double hearsay. Rumors and comments made by out-of-court colleagues are inadmissible hearsay that cannot be used to overcome summary judgment. *See Lewis v. Powers*, No. 1:15-CV-02692-MEH, 2018 WL 6272259, at *2 n.5 (D. Colo. Nov. 30, 2018) ("But a rumor from an unnamed person constitutes hearsay under Federal Rule of Evidence 801(c) and 802; as such, it is not admissible evidence and may not serve to create a genuine issue of material fact for summary judgment purposes.").

To the extent Ms. Lingenfelter is arguing that the statements are offered instead to show only that her co-workers complained about her FMLA leave, they are still inadequate. First, other than the allegation that "everyone" felt this way, which as noted is hearsay, there is almost

no evidence most of these complaints made it to decisionmakers. And even if Mr. Espinosa's statement was made in front of Ms. Cameron in August 2017, as the facts viewed in the light most favorable to Ms. Lingenfelter might establish[4], it does not support a reasonable inference that the subsequent disciplinary process was mere pretext undertaken in response to his complaint. *Young v. Dillon Companies, Inc.*, 468 F.3d 1243, 1253 (10th Cir. 2006) (Gorsuch, J.) ("In order to state a claim under Title VII, we have repeatedly explained that 'the plaintiff must demonstrate a nexus between the allegedly discriminatory statements and the defendant's decision to terminate her.'" (quoting *Rea v. Martin Marietta Corp.,* 29 F.3d 1457 (10th Cir.1994)). Nor is it clear that, even if the complaint triggered Ms. Cameron's disciplinary actions, that would be a violation. It could only be if Ms. Cameron acted not just in order to resolve apparent conflicts among employees, which is of course a bona fide reason to take employment actions, but because she, Ms. Cameron, also believed the protected leave was the source of the problem. There is no evidence to support that inference (other than, perhaps the rumor and hearsay discussed above). *See Pastran v. K-Mart*

---

[4] The only evidence that Ms. Lingenfelter cites in support of her assertion that Mr. Espinosa made comments about her FMLA leave at a meeting in August 2017 that Ms. Cameron attended is her own declaration filed with her response in opposition to Defendants' motion for summary judgment. But as noted above, Ms. Lingenfelter's declaration contradicts her sworn deposition testimony, there is no evidence she didn't have information about the meeting when she was deposed, and her declaration doesn't attempt to clear up any confusion in her deposition testimony. Thus, her declaration seems to be an improper attempt to create a "sham" fact issue on summary judgment. *See Burns v. Bd. of Cty. Comm'rs of Jackson Cty.*, 330 F.3d 1275, 1282 (10th Cir. 2003) (summarizing factors for determining whether an affidavit is an attempt to create a sham fact issue that can't be used to overcome a motion for summary judgment). But even assuming Ms. Lingenfelter's declaration is properly before the court, its factual content isn't sufficient to overcome Kaiser's non-retaliatory explanation for termination as explained.

*Corp.*, 210 F.3d 1201, 1206 (10th Cir. 2000) ("The pertinent question in determining pretext is not whether the employer was right to think the employee engaged in misconduct, but whether that belief was genuine or pretextual."). Mr. Espinosa or other employees' comments are not probative of that question.

Third, Ms. Cameron's refusal to review the commitment letter cannot serve as a basis for pretext. Viewing the facts in the light most favorable to Ms. Lingenfelter, she did not present the second commitment letter to Ms. Cameron until after Ms. Cameron had said she was going to terminate Ms. Lingenfelter. Had Ms. Lingenfelter provided the more responsive letter at the beginning of the December 11 meeting, as she was required to do so under the corrective-action plan, refusal to accept it might be evidence of pretext. But that's not what happened. By the time the second letter was offered, the decision had already been made and announced to Ms. Lingenfelter. There is no evidence that in making that decision Ms. Cameron knew anything about the second letter, and thus it cannot be relevant to her motive at the time the decision was made. The disputed evidence only goes to whether Ms. Cameron declined to reconsider her decision; but as far as the court has been made aware, there is no legal right to have an otherwise-legitimate termination reconsidered based on after-the-fact attempts to comply with employment conditions.

Ms. Cameron's last category of evidence is that Ms. Cameron skipped Levels 1-3 of the grievance procedure in December 2017. "Evidence that [an employer] acted contrary to a written company policy prescribing the action to be taken by the [employer] under the circumstances" is prototypical evidence of pretext. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000). The trouble here is that the undisputed facts establish that immediate escalation to Level 4 of the

15

grievance procedure (a) didn't violate the terms of the procedure and (b) was unusual but not unheard of. Indeed, Ms. Lingenfelter's own union representative, Ms. Mayberry, testified that she had seen immediate escalation to Level 4, albeit in a drug-use case. Doc. 49-2 at ¶ 3. And in fact, Kaiser often does so. *See* Doc. 54-2 at ¶ 6 ("Although Kaiser generally utilizes progressive discipline to address performance and behavior issues, *i.e.*, a manager will state with a Level 1 and progressively move upward if the behavior or performance does not improve, managers can and do skip levels if they believe that an employee's underlying behavior is sufficiently serious to warrant more severe discipline."). It is thus undisputed that it isn't a violation of the grievance procedure to jump immediately to Level 4 in some circumstances. Ms. Mayberry further testified that "under normal circumstances, in a case like this, management and the union would bring the parties together to discuss the issue. If that does not work, then issue raises to a Level 1." *Id.* at ¶ 4. That may indeed be the normal route. But Ms. Lingenfelter doesn't dispute that she had had a number of formal and informal discussions with management, and she also does not contest that it is within the discretion of a manager, under Kaiser's plan, in some instances to escalate immediately past Levels 1–3. In other words, while it was perhaps atypical, the evidence does not show that Ms. Cameron's procedure here violated a company policy.

This case has much in common with that before the Tenth Circuit in *Metzler*. There, like here, the court concluded that the temporal proximity between the conduct protected by the FMLA and the adverse employment action was if tenuous, enough to meet the causation requirement of the prima facie case. 464 F.3d at 1171–72. Nevertheless, like here, the plaintiff's evidence there was insufficient to create a triable issue on pretext. In many ways, the evidence is of a type in the

16

two cases. For example, the same temporal proximity that sufficed to show causation was not enough to show pretext. *Id.* at 1172. The *Metzler* court also ruled that evidence presented by the plaintiffs of negative comments made about her work performance were not, by themselves, sufficient to create a triable issue of pretext. *Id.* at 1175. Similarly, the court considered evidence that the employer had failed to follow company policy, and ruled that the undisputed facts showed that it had done so. *Id.* at 1176–77.

Although she has presented contested evidence that some coworkers may have resented her FMLA-related absences, she has no evidence that those complaints were shared by management or even conveyed to them. Her evidence is thus entirely circumstantial. And even viewing that evidence in the light most favorable to Ms. Lingenfelter, it is not possible to conclude that Kaiser's asserted, legitimate rationale is "so weak, implausible, inconsistent, incoherent, or contradictory as to support a reasonable inference that [Kaiser] did not act for those reasons." *Id.* at 1179. Most tellingly, perhaps, the uncontested evidence shows that even though Ms. Cameron may have skipped ahead in the usual disciplinary process, she still gave Ms. Lingenfelter a simple means of retaining her job: writing a letter taking responsibility for inappropriate actions and laying out a plan for improvement. Ms. Lingenfelter admits that her initial response was a single sentence that did not meet those requirements. Had she done what was required, when it was required (not later, after the first letter was rejected), it does not appear to be contested that she would still have her job. In other words, the uncontested evidence is that Kaiser would not have fired Ms. Lingenfelter had she provided a more responsive letter at her final meeting with Ms. Cameron. That she chose not to does not make Kaiser's explanation for terminating her "unworthy of belief," *Kendrick*,

17

220 F.3d at 1230, or "so weak, implausible, inconsistent, incoherent, or contradictory as to support a reasonable inference that [the employer] did not act for those reasons." *Metzler*, 464 F.3d at 1179. She hasn't produced evidence that Kaiser's reason was false, that it was contrary to company policy, or that she was treated differently than similarly situated employees—*i.e.* the prototypical ways to demonstrate pretext. *Id.* Kaiser is thus entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, Kaiser's motion for summary judgment (Doc. 48) is GRANTED. The clerk is directed to enter judgment for Kaiser and close the case.

DATED: February 24, 2021.    BY THE COURT:

_____
Daniel D. Domenico
United States District Judge